**DREHER LAW FIRM**
Robert Scott Dreher, SBN 120527
835 Fifth Avenue, Suite 202
San Diego, CA 92101
Telephone: (619) 230-8828
Facsimile: (619) 687-0142

**MILLER LAW FIRM**
Matthew R. Miller, SBN 194647
Carlos Americano, SBN 257070
835 Fifth Avenue, Suite 301
San Diego, CA 92101
Telephone: (619) 687-0143
Facsimile: (619) 687-0136

Attorneys for Defendant/Counter-Claimant GAN SOUTHGATE

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MALIBU MEDIA, LLC, a California corporation,<br><br>                Plaintiff,<br><br>        vs.<br><br>GAN SOUTHGATE,<br><br>                Defendant. | Case No.:  3:12-cv-00369-DMS-WMC<br><br>**DEFENDANT/COUNTER-CLAIMANT'S COUNTERCLAIM**<br><br><br><br>***FILED        CONCURRENTLY        WITH DEFENDANT'S ANSWER*** |
| GAN SOUTHGATE,<br><br>                Counter-Claimant,<br><br>vs.<br><br>MALIBU MEDIA, LLC, a California corporation,<br><br>                Counter-Defendant. | |

Defendant, GAN SOUTHGATE, by way of counterclaim against Plaintiff MALIBU MEDIA, LLC, alleges:

1.      Counter-Claimant is an individual residing in the State of California.

2.      This court has jurisdiction over Counter-Defendant MALIBU MEDIA, LLC (hereinafter "MALIBU"), because MALIBU has availed itself to this court to pursue an action against the GAN SOUTHGATE (hereinafter "SOUTHGATE"), and this is also therefore the proper venue.  This court has subject matter jurisdiction due to diversity and pursuant to the Declaratory Judgment Act, 28 U.S.C. 2201, 2202.

## I.
## FACTS COMMON TO ALL COUNTS

### A.      PARTIES

3.      SOUTHGATE is a 53 year old single mother of two children.  She has never downloaded a pornographic film or any other type of film through a BitTorrent.  In addition, she has never heard of "Tiffany Teenagers in Love" prior to being served in this action.

4.      SOUTHGATE has no knowledge of any other person or entity using her computer, router or modem to download a pornographic film.

5.      SOUTHGATE never authorized another person or entity to use her computer, router or modem to download a pornographic film.

6.      SOUTHGATE never benefited from, nor authorized, either explicitly nor implicitly, any person or entity to use her computer, router or modem to download a pornographic film.

7.      Upon information and belief MALIBU is either a producer, distributor and purveyor of pornography, or it is a shell corporation created solely and expressly for the purpose of purchasing copyrights to pornographic films in order to initiate lawsuits against

internet users and collect settlements from them.  It is unclear at this stage of the litigation which type of company MALIBU is; however, upon information and belief, it appears to be the latter.  An internet search of "Malibu Media LLC" turns up nothing but these lawsuits for copyright infringement.   There is no corporate website, no advertising or marketing materials, and, perhaps most important, no legitimate means for an individual to purchase the films that MALIBU claims to be trying to protect from infringement.

8.     To the extent that MALIBU holds any copyrights, SOUTHGATE is informed and believes that MALIBU purchased the rights to the pornographic films only after it discovered that the films had been the subject of infringing behavior for the sole purpose of initiating lawsuits such as described herein.  In this case, there appears to be no legitimate way to purchase "Tiffany Teenagers in Love," (the film that SOUTHGATE is accused of downloading.)  Indeed, an internet search of "Tiffany Teenagers in Love" results in dozens of websites that advertise the film as "free" to watch and/or download on their website.

9.     While MALIBU asserts that this action, and by extension the dozens of other identical cases filed by MALIBU in California and other states, are being filed in order to protect its copyrights in these pornographic films, upon information and belief, this case and all the others like it are part of a series of hundreds of litigations initiated over the past several years by MALIBU and other pornography companies.  Upon information and belief, to date, not a single one of the hundreds of cases filed by MALIBU and similarly situated producers of pornographic materials have ever been brought to trial.

10.     MALIBU has engaged in a deliberate, intentional and systematic course of action, knowingly relying on often false and inaccurate data, the purpose of which is not to protect their copyrights, but rather to embarrass, shame and coerce individuals who use the internet into paying a settlement in order to avoid litigation, regardless of whether those

individuals have actually done anything wrong.  MALIBU and the other pornography companies are blatantly misusing the power of the Federal Court system as a tool in their scheme.

11.     This wrongful course of action has been well documented in the media (see, for example, **Exhibit A** www.usnews.com article of February 2, 2012, "Porn Companies File Mass Piracy Lawsuits": http://www.usnews.com/news/articles/2012/02/02/porn-companies-file-mass-piracy-lawsuits-are-you-at-risk; and in a case in the U.S. District Court, Eastern District of New York, it has been called a "nationwide blizzard."  *In Re BitTorrent Adult Film Copyright Infringement Cases*, 2:11-cv-03995, 12-1147, 12-1150, and 12-1154, Order and Report and Recommendation dated May 1, 2012 at p.2.[1]

12.     Upon information and belief, the principal and or principals of Malibu Media LLC are also the principal(s) of another pornography company known as Click Here LLC which owns the pornographic website X-Arts.com.  The registered address of Click Here LLC is 31356 Broad Beach Road, Malibu, California 90265, which is the same address alleged for Malibu Media, LLC. See MALIBU's First Amended Complaint ("FAC") ¶ 6.  The agent for service of process, Brigham Field, is the same for Malibu Media, LLC and Click Here LLC.

### The For-Profit Business Model of the "Copyright Trolls"

13.     These pornography companies who are pursuing infringement lawsuits as a for-profit business model have become known as "copyright trolls."

14.     The first step in the "copyright troll" business is the collection of IP (internet protocol) addresses.   A third party investigator or "harvester" gathers and collects information regarding IP addresses that are allegedly transmitting a copyrighted work via

---

[1] It is notable that in two of the four cases to which that order applies, the Defendant is Malibu Media, LLC.

BitTorrent.  In some cases, the investigators contact the pornography companies to alert them to this potential source of revenue.  See, **Exhibit B**, Business Proposal by Anti-Piracy Management Company LLC (APMC) which presents this business model in detail.  Upon information and belief, APMC operates in a substantially similar if not identical fashion as IPP Ltd., the "harvester" used by MALIBU in this case.  APMC, an IP "harvesting" firm, offers to collect IP "evidence" which is then "sent to the law firm in the jurisdiction in question so it can prepare an application to court for a disclosure order against the ISPs.  Then the names and address (sic) relating to the IP addresses identified can be acquired… The infringers are then written to and a demand for payment of damages and costs is made…" Of great interest is the concluding sentence of the third paragraph on the first page: **"If payment is not forthcoming, proceedings are then commenced to obtain an order from the court, which can then be enforced against the infringer, if necessary, and also sent to other infringers, *pour encourager les autres*.  (in order to encourage the others)."** (italics in original, emphasis added).  This sentence could not be more clear: it is part of the business plan to utilize court proceedings against one individual to threaten and intimidate other individuals.

15.     Indeed, that is exactly what is happening in California and that has already happened in Colorado: as will be demonstrated below, MALIBU has filed dozens of cases against hundreds of Doe defendants.  In fact, on August 16, 2012 a notice of related cases was filed by a "John Doe #8" in case 3:12-CV-01135.  According to the notice, there are 17 cases filed by Plaintiff in San Diego alone.  Clearly, SOUTHGATE is being used as an exemplar "pour encourager les autres" in the words of APMC's business proposal.  SOUTHGATE's case can be used as an additional threat to hold over other Does – "look

what happened to this lady when she didn't settle."  The term "to encourage the others" is shockingly disingenuous, when what it really means is to hold a club over their heads.

16.    APMC's proposal goes on to say that the monetary amount claimed should not be excessive: "Ordinarily, we usually claim from each infringer an amount (depending on the copyright work involved) which is not unduly excessive, the aim being for the infringer to experience receiving **an expensive, but affordable, 'parking ticket'** for his or her misdemeanor."  Exhibit B, p. 1, para. 4 (emphasis added).  APMC happily asserts a 25% success rate after the initial demand letter and notes, "[u]p to a further 10% tend to pay once they have had their questions answered."  APMC notes that "the deterrent effect (and revenue collected) can be quite substantial."  APMC also brags about its partner law firms' success at obtaining court orders, a key element to the success of this scheme.  This for-profit business model is further complicated by the fact that the pornography company's attorney is paid a portion of any settlements received, establishing a champertous relationship ripe for abuse against mostly defenseless *pro se* defendants who would likely be bankrupted by even the most minimal legal defense.

17.    With such prospects for success, the pornography company rarely leaves the infringement to chance.  Frequently, MALIBU sets out to actively draw infringers to its films, and does so by uploading a digital file containing its films to the internet.  This digital file planted on the internet is known as a "honeypot."  There appears to be no legitimate way to purchase "Tiffany Teenagers in Love," (the film that SOUTHGATE is accused of downloading.)  An internet search of "Tiffany Teenagers in Love" results in dozens of websites, which advertise the film as "free" to watch and/or download on their website.

18.    Once this file becomes involved in a BitTorrent download, the pornography company, through its investigator, can track other IP addresses that may or not be involved

in the BitTorrent.  It is well known that the kind of tracking technology commonly used by such companies is not reliable and may result in "false positives" showing infringement by devices such as printers, routers or telephones which are incapable of performing the download; see, e.g., **Exhibit C**, Piatek, Kohno, and Krishnamurthy, Challenges and Directions for Monitoring P2P Filesharing Networks, or Why My Printer Received a DMCA Takedown Notice, http://dmca.cs.washington.edu/dmca_hotsec08.pdf.

19.    Once IP addresses are collected, the company files a Complaint in Federal Court claiming that hundreds or thousands of individuals have illegally downloaded their copyright protected materials.  The Complaint identifies the defendants as "John Does" and states that they are subscribers to certain IP addresses.  The Complaint further avers that the subscriber to the IP address is the infringer who illegally downloaded the copyrighted pornography.  This statement is without foundation in the law or in common sense, and yet the pornography companies are counting on the possibility that some judges would not be technologically savvy to accomplish their goals.[2]

20.    MALIBU further represents to the court in its Complaint that the Doe defendants are all guilty of downloading MALIBU's copyrighted works; that the acts of copyright infringement occurred using each of the Doe defendants' IP addresses; and that the ISP can correlate or connect  the IP address to the Doe defendant's true identity. MALIBU makes these statements despite the fact that, at this point, the identity – and therefore, the conduct, actions and intent – of any of the defendants is entirely unknown to MALIBU.

---

[2] Magistrate Judge Gary R. Brown, for one, was not fooled: "Thus, it is no more likely that the subscriber to an IP address carried out a particular computer function – here the purported illegal downloading of a single pornographic film – than to say an individual who pays the telephone bill made a specific telephone call."  In Re BitTorrent Adult Film, supra, 2:11-cv-03995, May 1, 2012, at p.6.

21.     Furthermore, MALIBU made these statements even though it knew or should have known that the IP addresses it identifies in the Complaint do not represent people, nor can they even be said with certainty to be computers; in fact, an IP address may be assigned to or attached to many different kinds of electronic devices, such as wireless routers, video games, printers, telephones, or indeed any other device capable of operation through a modem.   Numerous courts have definitively affirmed this principle.   *See,e.g., In Re BitTorrent Adult Film*, supra, 2:11-cv-03995, May 1, 2012, at p. 6; *Malibu Media LLC v. John Does* 1-10, 2:12-cv-3623, Order, June 27, 2012.

22.     Furthermore, MALIBU made these statements in the Complaint even though it knew or should have known that even if a computer was used to illegally download, copy, and distribute its materials through the IP addresses it identifies in the Complaint, that fact in no way ties the act to a specific person.   The act could have been done by another person with a computer connected to the IP address without the knowledge or consent of the subscriber.   In the case of a wireless internet connection, the alleged infringing activity could have been performed by any person with a computer within range of the wireless network, a fact of which MALIBU was or should have been well aware.   It could also have been done from a remote location by an individual or entity who had "spoofed" or duplicated the subscriber's IP address, a fact of which MALIBU was or should have been well aware.

23.     The high error rate of the IP "harvesters" has been acknowledged by at least one pornography company defendant.   In one case in the Southern District of New York, counsel for the defendant "estimated that 30% of the names turned over by ISPs are not those of individuals who actually downloaded or shared copyrighted material."   Opinion and Order, *Digital Sin, Inc. v. John Does 1-176*, 2012 W.L. 263491, 12-cv-00126 (S.D.N.Y. Jan.

30, 2012), at p. 5.  This high error rate, shocking in and of itself, is compounded by the nature of the allegations that the Complaint makes public – namely, the illegal download of hardcore pornographic materials – which can have a devastating effect on the personal and professional lives of those falsely accused.

24.     To highlight the recklessness and malice with which MALIBU in this case has acted, if for example a federal prosecutor were to bring criminal charges of, say, downloading child pornography based upon harvested IP addresses with a known error rate of approximately 30%, not only would that be a clear abuse of process – not to mention running afoul of numerous Constitutional protections – but would likely be criminally actionable prosecutorial misconduct.  By the same token, no civil attorney would bring such frivolous and misguided lawsuits – the cost of which would bankrupt the average MALIBU – based on a known 30% rate of innocence without seriously implicating duties under Federal Rule of Civil Procedure 11 as well as 28 U.S.C. 1927.  Such actions as those demonstrated by MALIBU and its attorney personify a policy of "shoot first, ask questions later" style of litigation.

25.     MALIBU next typically (i.e. this case) files a motion requesting expedited discovery, seeking leave to serve subpoenas upon the ISPs (Internet Service Providers) that issued the IP addresses.  The subpoena, when issued, commands the ISP to release personal identifying information of the subscriber associated with that IP address – generally the individual's name and address; often, his or her telephone number and email address as well.  Because the Does are anonymous and never find out about it, the motion stands unopposed.  In reliance on the unfounded and false representations of MALIBU and its counsel – which the Doe defendants have no opportunity to oppose – the court grants

leave for MALIBU to issue the subpoenas.   In this case, Cox Communications notified SOUTHGATE of the subpoena.

26.    MALIBU knows and intends that the ISPs will pass along the subpoenas to the subscribers whose identifying information is sought.  A Doe defendant faced with such a subpoena is unlikely to be sophisticated or knowledgeable about the law, and is likely to be frightened and intimidated by the receipt of such a document.  In most cases, a Doe defendant will be unaware of his or her right to move the court to quash the subpoena; even if the Doe defendants knows of this right, in many cases, he or she is unlikely to be able to afford an attorney to do so.  The Doe defendant, afraid of being involved publicly in such an unseemly litigation – indeed, in any litigation – may simply contact MALIBU's counsel in an attempt to make the problem go away.  Or, the Doe defendant may simply ignore the notice, which will result in the ISP's turning over of his or her personal identifying information to MALIBU.  Here, SOUTHGATE lacked the funds to have an attorney oppose the subpoena.   And even if she could afford an attorney she was stuck in a catch 22 because by appearing to challenging the subpoena she would have to disclose to MALIBU who she was, which is the very information she is seeking to protect.

27.    Once MALIBU is in possession of the personal identifying information of the Doe defendants, MALIBU begins a process of trying to get settlements.  Depending on MALIBU's business plan, this may begin with high-pressure phone calls or letters, but it always involves informing the defendant that he or she is about to become the target of a litigation that will accuse him or her of downloading pornography; that the defendant stands to lose hundreds of thousands of dollars in statutory damages and attorney's fees for each alleged incident, not to mention having to retain an attorney on his or her own behalf; and that the defendant can make it all go away for a comparatively small amount of money,

usually several thousand dollars.  *See* **Exhibit D**, settlement letter sent to LiuXia Wong, filed in *LiuXia Wong v. Hard Drive Productions, Inc., and Does* 1-50, 4:12-cv-00469.  In no instance is any offer of innocence, or even an offer to inspect a John Doe's personal computer, accepted.  Such a personalized investigation would simply be too time consuming and would hurt the business by actually discovering that many of those who stand accused are in fact innocent.  In this case, an agency outside MALIBU's law firm – and located in Florida – called SOUTHGATE and left a message pertaining to a subpoena.  Counsel for SOUTHGATE returned the phone call and was informed that the lady who had left a message, Jill Jacobs, was not an attorney but, that she could settle the case for $3,500.

28.     If MALIBU was truly concerned about protecting its copyrights and preserving the profits thereon, one would expect to see such companies take certain actions once they had the IP addresses and personal information obtained through their investigations and lawsuits.  One would expect to see MALIBU issuing Digitals Millenium Copyright Act (DMCA) takedown notices, or sending out cease-and-desist letters, or seeking injunctive relief in the courts.  Such a course of action would be reasonable to expect in a company that sought to minimize illegal downloads, mitigate damages, and protect its copyrights.  However, that is not the course of action pursued by these pornography companies.  To the contrary, not only do they not remove their films from the internet, they encourage the continued downloading of their works through the use of "honeypots" in order to promote the income stream to be obtained through settlements of threatened lawsuits.

29.     Due to the vast number of individuals being sued, the burden of pursuing these Does is often passed on to a call center where non-attorney agents of MALIBU repeatedly call, harass and threaten the Does, who often have no idea that their information

was even turned over to MALIBU by their ISP.  These calls can go on for months.  They often contain threats of criminal prosecution for "exposing minors to pornography" and pointedly remind the Doe defendant that they do not want the publicity that a lawsuit would bring.  One Colorado Doe defendant was threatened with such criminal action in exactly this way, and was told ominously that he wouldn't want to see his name in the Denver Post.  See, Declaration of John Doe, **Exhibit E**, paras. 5 and 3.  This Doe was also threatened that the company that gathered the information on his IP address could tell whether he had sold the allegedly downloaded movie and whether he had downloaded other copyrighted material in which case, they would sue him for that too.  Exhibit E, paragraph 6.  He was also told explicitly that if he did not settle, they would sue.  These harassing phone calls continued, with only a short break, for a period of fourteen months.  Exhibit E, para. 10.

30.     Based upon information and belief, counsel for MALIBU does not engage in settlement discussions with putative defendants of counsel; this is left to others.  Upon information and belief, the "call center" is being actively used by MALIBU and MALIBU's counsel in this case and numerous other BitTorrent cases referred to in this document to make continuing harassing and intimidating phone calls to Doe defendants, threatening them with public humiliation and, in some cases, with criminal action.  The sole purpose of these threats and statements is to coerce the Doe defendants into paying a quick monetary settlement of a few thousand dollars without MALIBU and MALIBU's attorney having to file an additional lawsuit (after the Doe lawsuit in which the defendant's identifying information was obtained).  Upon information and belief, the "call center" acts as MALIBU's agent in this matter with the full knowledge of MALIBU and MALIBU's counsel, and in fact at the direction of MALIBU and/or some other individual acting on MALIBU's behalf.

31.    The defendant pornography companies utilize the emotional impact of their lawsuits, or threat thereof, in order to manipulate, influence and coerce the Doe defendants into settling.  There can be no doubt that it is a frightening prospect to be part of a lawsuit, to say nothing of the prospect of thousands or hundreds of thousands of dollars in attorney's fees, which most people cannot afford.   Moreover, these pornography companies rely upon the public stigma which attaches to accusation of having downloaded pornography and the scorn and disgust which such an idea engenders in the public mind. That this distasteful act was also committed illegally increases the harm of the accusation exponentially.  Separate or combined, these accusations, if made public, may brand and stigmatize the innocent accused in ways that may be difficult if not impossible to overcome. Family relationships, friendships, community standing, business and commercial opportunities, career advancement, eligibility to run for or assume public office, the ability to work in any capacity with children or youth groups such as in ways such as teaching, coaching, or scouting volunteer, the ability to gain security clearance, eligibility for the Bar or medical school admission, qualification for a passport or visa: all of these may be adversely impacted by the allegation, even if it is never proven.   Such allegations, knowingly based on grossly inaccurate information, is the quintessential definition of a willful abuse of the judicial process that has a devastating effect on the wrongly accused.

32.    In this matter, these pornography companies can sue thousands of Doe Defendants and, based upon APMC's estimates, they can expect a 35% settlement rate with payoffs from hundreds of Does in thousands of dollars.  A truly terrified Doe defendant – one who, like a teacher, stood to lose their livelihood – might settle for tens of thousands of dollars.   Thus, with very little effort on its part, a pornography company can profit substantially by simply collecting information about individuals who are engaging in any

kind of activity on the internet.  And considering we can't find a seller of "Tiffany Teenagers in Love," lawsuits such as this one are more valuable then selling the pornography itself.

33.    This "for-profit litigation model" is especially pronounced as the Court begins to appreciate the sheer magnitude of the numbers of potential John Does that can be named in a single or even multiple lawsuits by a single attorney.  As here, it would be impossible for MALIBU to litigate to trial every IP addresses harvested.  In that sense, the only way that such a model can work is to assert weak claims of copyright infringement, while evading any type of judicial review of the merits of the actual case.  As time passes and courts begin to question why such cases never progress, the Plaintiffs then file a few token suits against individuals to provide a patina of legitimacy.

34.    As the Fifth Circuit recently affirmed in *dicta*, not surprisingly in affirming contempt sanctions for an identical "copyright troll" "[t]his course of conduct indicates that the Plaintiffs have used the offices of the Court as an inexpensive means to gain the Doe defendants' personal information and coerce payment from them.  The Plaintiffs seemingly have no interest in actually litigating the cases, but rather simply have used the Court and its subpoena powers to obtain sufficient information to shake down the John Does. Whenever the suggestion of a ruling on the merits of the claims appears on the horizon, the Plaintiffs drop the John Doe threatening to litigate the matter in order to avoid the actual cost of litigation and an actual decision on the merits."  *Mick Haig Production v. John Does 1-670, v Evan Stone*; *Order affirming contempt sanction*, Case 11-cv-10977, p. 6, July 12, 2012; citing *Raw Films, Ltd. v. Does 1-32*, 2011 WL 6182025, at *3 (E.D. Va. 2011).

35.    That this is a nationwide campaign akin to a plague of locusts cannot be denied.  What started in 2010 had by January of 2011 impacted some 100,000 individuals in the United States.  https://torrentfreak.com/100000-p2p-users-sued-in-us-mass-lawsuits-

110130/.   By August of 2011, that number had passed the 200,000 mark. http://torrentfreak.com/200000-bittorrent-users-sued-in-the-united-states-110808/, and by February, 2012, the number had passed 250,000.  Tens of thousands of individuals every month are being victimized by this extortionate scheme.  A review of various courts' dockets show that such huge numbers are being pursued by only a handful of attorneys around the country, perhaps fewer than twenty.  As such, it is clear to any reasonable observer that such suits are essential to mass "for-profit" litigation schemes that are not designed to be actually litigated in court, but merely enforced through harassing phone calls and threatening letters, with the occasional "token" suit being filed to intimidate and frighten the others into wondering: "Will I be next?"

36.     Upon information and belief, the mastermind and driving force behind many of the copyright trolls, including Malibu Media, LLC, is a Florida attorney named M. Keith Lipscomb, Esq.  In an email, Mr. Lipscomb asserts to Brad Patrick, Esq., an attorney representing several Doe defendants, that Mr. Lipscomb's clients include Patrick Collins, Inc. and Kbeech, Inc., and that "my clients' lawyers" will begin filing suits for copyright infringement in a multitude of jurisdictions: that as of the date of the email, July 1, 2011, they had already filed "over 50 federal cases in NY, CA, DC, MD, VA, NY, NJ, CO, FL and my clients have counsel retained and any moment cases in TX, AZ, IL, CT, GA. (sic)" **Exhibit F**, email dated July 1, 2011, p. 1.  This clearly evinces a nationwide strategy with several layers of attorneys and clients involved.  The current flooded state of the Federal docket shows that Mr. Lipscomb's plan is being implemented.

37.     Mr. Lipscomb's plan is, in his own words, "a campaign."  Exhibit F, email dated July 1, 2011, p. 2 Mr. Lipscomb warns Mr. Patrick that his motions to quash filed on behalf of his Doe defendant clients were "impeding our ability to use the court system in a

way that we believe we are legally entitled to do it" and that "*[w]e cannot stand for that*

under any circumstances.  Accordingly, the state court arguments have been teed up and

to exert the maximum amount of pressure that we can we are filing (sic) to file individual

federal suits to *teach your clients the lesson that this is not the way to deal with us*."  Id.,

emphasis added.  Mr. Lipscomb, the mastermind of the pornography companies' legal

strategy, is quite clear: when Doe defendants desist, it will not be tolerated and those Does

must be taught a lesson, and the means of imposing that lesson is the filing of a federal

lawsuit.

38.     Moreover, Mr. Lipscomb reveals that the filing of such federal suits will not be

burdensome or difficult for these attorneys because "the federal court suits have been

standardized."  Id.  Thus, for all of the clients Mr. Lipscomb represents and/or advises –

and upon information and belief, this includes MALIBU – there is very little cost or effort

required to file and prosecute the federal lawsuits, as the work has already been prepared

and "standardized."

39.     Mr. Lipscomb warns Mr. Patrick not to "test" him.  "[I]f we have to file suit, our

settlement demands will increase.  Toward that end, you should also apprise your clients

that the average cost of a copyright litigation is 600K through trial, according to an AIPLA

survey of fees in IP cases."

40.     One month later, in a subsequent email, Mr. Lipscomb threatens Mr. Patrick's

clients with further litigation if they do not settle:

> …you can tell your clients that IPP[3] is one of three
> companies doing these scans and that they have provided

---

[3] IPP is the same "harvesting" company retained by MALIBU herein, yet another indication of the connection between Mr. Lipscomb and MALIBU.  If IPP's collection techniques mistakenly obtained Defendant's IP address, it is not unlikely that IPP Collection techniques also mistakenly obtained the information asserted here by MALIBU's Counsel, nor is it unlikely that MALIBU's Counsel was well aware of that fact.

me with information which establishes several of your clients infringed movies from studios that I do not represent.  In my individual suits, I am going to call all of those studios and have them become additional Plaintiffs.   Right now, statistically there is only about a .1 percent chance they'll get hit by these studios with a suit.  Then I am going to go the (sic) other two companies that scan and get all the other Plaintiffs I can from all of them.  **Exhibit G**, email dated August 25, 2011.

41.    Mr. Lipscomb is the attorney involved in the case of the Colorado Doe defendant who has been repeatedly harassed by telephone calls from a call center in Florida.   One Mr. Stern, calling on behalf of Mr. Lipscomb's law firm, informed the Doe defendant that he was involved in a lawsuit in a Florida court.  Mr. Stern, on Mr. Lipscomb's behalf, also told Doe, among other threats, that because he maintained an open wireless connection, he was facing criminal prosecution for exposing minors to pornography. Further, Mr. Lipscomb himself sent Doe a letter informing him that if he did not settle, Lipscomb would sue.  Exhibit G.

42.    Upon information and belief, counsel for MALIBU, Mr. Adam Silverstein and/or Ms. Leemore Kushner, is directly associated with, and indeed takes direct instructions from, Mr. Lipscomb and that the two are jointly involved in MALIBU's nationwide "campaign."  Upon information and belief, Mr. Lipscomb specifically instructed Mr. Kotzker to file against a Doe defendant in Colorado because Mr. Patrick would not withdraw his motions to quash; this is alluded to in Mr. Lipscomb's email of July 1, 2011: "So, if they want to test me sooner, just pick a Doe in Florida, Colorado or California and say he is not going to settle today and that suit will be filed over the weekend."  Exhibit F, page 2.

/ / /

**Malibu's Actions Leading Up To The Current Litigation**

43.     Upon information and belief, MALIBU utilized a "honeypot" to lure potential infringers.   Upon information and belief, MALIBU and/or its employees and/or IPP Ltd., acting as its agent and with its authorization and consent, intentionally placed these films together and created a "honeypot."

44.     MALIBU utilized IPP Ltd., a third party investigator, to "harvest" information regarding IP addresses.  (FAC ¶13.)  Upon information and belief, as part of the process of "harvesting" IP addresses, companies such as IPP Ltd., must upload an original copy of the digital file in order to participate in a "swarm" and track downloads and obtain IP addresses allegedly involved in BitTorrents.   Thus, SOUTHGATE is informed and believes that MALIBU either created and uploaded the website which it claims SOUTHGATE infringed, or it authorized IPP Ltd., to do so with the specific purpose of tracking IP addresses and initiating lawsuits.[4]

45.     Having collected IP addresses through IPP Ltd., MALIBU has followed the "copyright troll" business model and has filed hundreds of "John Doe" lawsuits against thousands of Doe defendants in fourteen separate Federal district courts.   MALIBU has brought cases in California, Colorado, the District of Columbia, Florida, Maryland, New York, Pennsylvania and Virginia.  MALIBU has expanded into Illinois, Indiana, Kentucky, Michigan,          New          Jersey          and          Texas.          See, http://dockets.justia.com/search?query=malibu+media.   This is in line with the nationwide "campaign" delineated in Mr. Lipscomb's letter.

---

[4] As noted above, SOUTHGATE denies having participated in any BitTorrent that may have downloaded any of MALIBU's allegedly copyrighted films.  There are many different ways that IPP Ltd. may have erroneously or falsely obtained the IP address assigned to SOUTHGATE's account by Cox Communications.

46.     Now in possession of personal information of hundreds of California Doe defendants and thousands of Does in other states, MALIBU has not behaved in a manner to protect its copyrights and mitigate its damages.  Upon information and belief, it has not caused any Digital Millennium Copyright Act (DMCA) takedown notices to be issued, it has not sent any cease-and-desist letters, and it has not sought injunctive relief or any restraining orders against the Does against the use or distribution of MALIBU's allegedly copyrighted films.  Most notably for example, out of the hundreds of Does it has sued to obtain personal information, it has commenced only two cases in Colorado that actually name any defendants, and upon information and belief, this was only done at the prompting of a show cause order issued to MALIBU's counsel, Mr. Kotzker, for lack of prosecution of MALIBU's numerous cases.

### The Case Before This Court

47.     MALIBU commenced the instant action against SOUTHGATE by filing a suit against fifteen "John Does" (Case No. 3:12-cv-00369) on or about February 10, 2012.  The sole purpose of that action was to obtain the issuance of subpoenas to the John Does' internet service providers (ISPs) in order to determine the identity of the John Does.

48.     On February 27, 2012, MALIBU filed Malibu Media LLC v. John Does 1-8, Case No. 2:2012-cv-01647.  A day later it filed another lawsuit Malibu Media LLC v. John Does 1-8, Case No. 2:2012-cv-01647.

49.     On April 26, 2012, MALIBU filed thirteen (13) more lawsuits as follows:

| Malibu Media LLC v. John Does | Case No. 2:2012-cv-03615 |
| Malibu Media LLC v. John Does | Case No.8:2012-cv-00649 |
| Malibu Media LLC v. John Does | Case No. 8:2012-cv-00650 |

| Malibu Media LLC v. John Does | Case No. 2:2012-cv-03617 |
| --- | --- |
| Malibu Media LLC v. John Does | Case No. 8:2012-cv-00651 |
| Malibu Media LLC v. John Does | Case No. 8:2012-cv-00652 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-03619 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-03620 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-03621 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-03622 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-03614 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-03623 |
| Malibu Media LLC v. John Does | Case No. 8:2012-cv-00647 |

50.    On April 30, 2012, MALIBU seven (7) more cases as follows:

| Malibu Media LLC v. John Does 1-8 | Case No. 3:2012-cv-01054 |
| --- | --- |
| Malibu Media LLC v. John Does 1-7 | Case No.3:2012-cv-01052 |
| Malibu Media LLC v. John Does 1-19 | Case No. 3:2012-cv-01049 |
| Malibu Media LLC v. John Does 1-12 | Case No. 3:2012-cv-01059 |
| Malibu Media LLC v. John Does 1-11 | Case No. 3:2012-cv-01056 |
| Malibu Media LLC v. John Does 1-11 | Case No. 3:2012-cv-01061 |
| Malibu Media LLC v. John Does 1-10 | Case No. 3:2012-cv-01051 |

51.    On May 9th and 10th, MALIBU filed five (5) further such cases, as follows:

| Malibu Media LLC v. John Does 1-35 | Case No. 3:2012-cv-01135 |
| --- | --- |
| Malibu Media LLC v. Unknown | Case No. 2:2012-cv-01261 |
| Malibu Media LLC v. Unknown | Case No. 2:2012-cv-01262 |

| Malibu Media LLC v. Unknown | Case No. 2:2012-cv-01255 |
|---|---|
| Malibu Media LLC v. Unknown | Case No. 2:2012-cv-01260 |

52.    On May 29, 2012 MALIBU filed sixteen (16) lawsuits as follows:

| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04654 |
|---|---|
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04662 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04658 |
| Malibu Media LLC v. Unknown | Case No. 2:2012-cv-00789 |
| Malibu Media LLC v. Unknown | Case No. 1:2012-cv-00886 |
| Malibu Media LLC v. Unknown | Case No. 2:2012-cv-01459 |
| Malibu Media LLC v. John Does 1 through 59 | Case No. 1:2012-cv-00888 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04651 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04653 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04657 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04649 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04650 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04652 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04656 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04660 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-04661 |

53.    From June 5, 2012 through July 31, 2012 MALIBU filed seventeen (17) additional lawsuits, as follows:

| Malibu Media LLC v. Unknown | Case No. 2:2012-cv-01514 |
|---|---|

| Malibu Media LLC v. Unknown | Case No. 2:2012-cv-01513 |
| --- | --- |
| Malibu Media LLC v. John Does 1-7 | Case No. 2:2012-cv-00809 |
| Malibu Media LLC v. John Does 1-13 | Case No. 2:2012-cv-00810 |
| Malibu Media LLC v. John Does 1-6 | Case No. 3:2012-cv-01355 |
| Malibu Media LLC v. John Does 1-5 | Case No. 3:2012-cv-01354 |
| Malibu Media LLC v. John Does 1-11 | Case No. 3:2012-cv-01357 |
| Malibu Media LLC v. John Does 1-36 | Case No. 3:2012-cv-01370 |
| Malibu Media LLC v. John Does 1-19 | Case No. 3:2012-cv-01372 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-05596 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-05592 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-05594 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-05595 |
| Malibu Media LLC v. John Does | Case No. 2:2012-cv-05593 |
| Malibu Media LLC v. John Does 1-16 | Case No. 3:2012-cv-01847 |
| Malibu Media LLC v. Unknown | Case No. 2:2012-cv-02007 |
| Malibu Media LLC v. John Does 1-13 | Case No. 2:2012-cv-01067 |

54.     The attorney representing MALIBU here is the same attorney who filed the sixty (60) above referenced separate cases against hundreds of John Does in the Federal District Courts for Southern, Central and Northern Districts of California on behalf of Malibu Media LLC.   The sheer number of cases filed by MALIBU and handled by Mr. Adam Silverstein and Ms. Leemore Kushner begs the question: how can one attorney diligently prosecute hundreds of cases at the same time in jurisdictions which are some two thousand miles apart?   The answer, of course, is that neither the attorneys nor MALIBU

have any expectation that they will have to, because they anticipate settlements from the majority of the Doe defendants before they ever have to start moving forward into litigation. The entire business model is built on this premise.

55.   On or about April 4, 2012, a subpoena was issued in the case of Malibu Media LLC v. John Does 1-15, Case No. 3:2012-cv-0369 to Cox Communications seeking the personal identifying information of Defendant.  Cox Communications provided a copy of this subpoena to SOUTHGATE.  See **Exhibit H**.

56.   In that letter from Cox, SOUTHGATE was informed that she had until May 24, 2012, to notify Cox Communication in writing of any objections and further, that it was necessary to "file your objections with the court and to raise any legal defenses you may have." Id.

57.   This placed SOUTHGATE in the position of either attempting to quash the subpoena on her own behalf, in which case she would have to appear in court *pro se* and thereby provide to MALIBU exactly the information it sought to obtain by the subpoena, or having to hire an attorney to bring a motion to quash on his behalf, which would have required a great deal of expense and could potentially have also resulted in SOUTHGATE's personal identifying information being provided to MALIBU if the court did not permit SOUTHGATE to proceed anonymously (not all courts have done so).  Moreover, at that point, SOUTHGATE did not comprehend the nationwide scope and malicious intent of MALIBU and the other copyright trolls.  In addition, she lacked the money to hire counsel to quash the subpoena.

58.   In late April/early May, a person named Jill Jacobs telephoned SOUTHGATE. She represented to SOUTHGATE that she was calling on behalf of Malibu Media and told SOUTHGATE that she was the "primary" and/or "main" defendant in a lawsuit about to be

filed.  She urged Defendant to obtain an attorney and to settle the matter.  On June 4, 2012, Defendant received a telephone call from Stephanie Hanson, who once again informed Defendant that she part of a lawsuit and would need to hire an attorney.  Upon information and belief, Ms. Hanson and Jacobs work for the aforementioned "call center" overseen by Mr. Lipscomb and Mr. Kotzker.

59.    SOUTHGATE did not settle because she is innocent.

60.    On or about July 10, 2012, MALIBU filed its First Amended Complaint to include SOUTHGATE as a named defendant.

61.    On or about July 13, 2012, SOUTHGATE was served with the Complaint in the instant matter.   Service was made at SOUTHGATE's place of work on a Friday afternoon when her co-workers and clients were present.

62.    The communications from MALIBU's agents and the manner in which the SOUTHGATE was served was clearly designed and intended to embarrass, manipulate and intimidate SOUTHGATE and coerce her into settling despite her innocence and despite the absence of any evidence against her.

<u>**CLAIM FOR RELIEF I**</u>
**ABUSE OF PROCESS**

63.    SOUTHGATE restates and alleges all of the allegations of the previous paragraphs as if more fully stated herein.

64.    MALIBU has wrongfully, improperly and illegally used the Federal Court system in an effort to obtain money from SOUTHGATE and the multitude of other defendants which MALIBU has sued in eight other Federal District Courts.

65.    The filing of the initial case, Malibu Media LLC v. John Does 1-15, Case No. 3:12-cv-0369-DMS-WMC, was done solely with the intent of generating the subpoenas

which would provide the identifying information of the individual defendants and to no other purpose.

66.     At the time that the initial case was filed, MALIBU had no knowledge as to the identities of any of the Doe defendants, and therefore, MALIBU could not honestly represent to the court that any reason to join all of these individuals existed.  According to the information provided by MALIBU to the court, the individual acts were alleged to have taken place on separate, distinct dates and times (See Exhibit H) and were in no way connected, and therefore, each individual John Doe ought to have been sued separately and each subpoena issued separately.  By filing the case against multiple defendants in this way, MALIBU evaded over ten thousand dollars in filing fees which ought to have lawfully been paid to the Court.

67.     MALIBU made misleading, false and fraudulent statements to the Court in order to convince the Court to grant its motion to issue subpoenas.  Further, MALIBU intentionally and maliciously misused the information obtained from those subpoenas to effect an object not within the proper scope of the subpoenas: namely, the extortion of settlement money from the Doe defendants.

68.     Once MALIBU had utilized the power of the courts to issue the subpoenas and obtain the SOUTHGATE's identifying information, this information was first used NOT to protect MALIBU's copyrights by issuing a DMCA takedown notice, or by sending a cease-and-desist letter or by taking any other reasonable measure that would demonstrate a desire to protect its copyrights and mitigate its damages.  Instead, an agent of MALIBU acting in some unknown capacity contacted SOUTHGATE in an effort to prevail upon her to settle the matter out of court.  MALIBU expected that it would cost SOUTHGATE thousands of dollars to obtain legal counsel and respond to a lawsuit, and MALIBU anticipated and

intended that the allegations of illegal conduct and the distasteful subject matter of such a lawsuit (namely, the pornographic nature of the films in question) would induce SOUTHGATE to settle quickly.

69.     When SOUTHGATE refused to settle, MALIBU filed the instant case, again avoiding the payment of multiple filing fees.  As with the case filed against the 14 other Does, there is no factual or legal basis for joining these defendants in one action.

70.     Thereafter, pressure to settle was still brought to bear in the form of phone calls, not from MALIBU's attorney of record, but by MALIBU's agents Jill Jacobs and Stephanie Hanson.  Service of the Complaint was made on a weekday afternoon when SOUTHGATE's co-workers and clients were known to be and likely to observe.  In all of these ways, MALIBU and its attorney intended to bring pressure to bear upon SOUTHGATE so that she would not oppose the lawsuit, so that she would seek to avoid the embarrassment and cost of litigating against MALIBU and pay MALIBU a settlement.

71.     MALIBU's conduct of these two cases against the Defendant must also be viewed in the light of the fact that this is not an isolated incident.  MALIBU has proceeded in this very same way in hundreds of cases in fourteen different states, and has snagged thousands of Doe defendants in its net, regardless of guilt or innocence.  Moreover, MALIBU is part of a nationwide network of pornography companies all working with a single goal: use the Federal Court system to obtain financial settlements from internet subscribers through bullying and intimidation.

72.     MALIBU's attorney also represents Patrick Collins, Inc., which upon information and belief, is essentially the same entity as Malibu Media LLC and is undeniably engaged in the same policy of mass copyright infringement litigation.  Patrick Collins, Inc., has already been chastised and warned by this court regarding its use of the

information it obtains from subpoenas in its Doe cases: '[t]he Court emphasizes that MALIBU may only use the information disclosed in response to the [*3] subpoenas for the purpose of protecting and enforcing its rights as set forth in its Complaint. *The Court cautions MALIBU that improper use of this information may result in sanctions.*" Patrick Collins, Inc. v. Doe, 2012 U.S. Dist. LEXIS 91249, 2-3 (D. Colo. June 29, 2012) (emphasis added).

73.    MALIBU has failed to pay court filing fees which were due and proper based on the causes of action MALIBU alleged.

74.    MALIBU has utilized this Federal Court in a manner which was intended to intimidate and harass the SOUTHGATE.

75.    The MALIBU's sole goal and motive is not a just and fair trial resulting in the preservation of any legal copyrights, but a swift extortion of money out of the pockets of an intimidated and embarrassed SOUTHGATE and other defendants like her.

76.    MALIBU will argue that it does not matter what its motives are where the end result is the same; that is, where it obtains monetary compensation for its allegedly infringed copyrights, it does not obtain some result which a defendant could not otherwise be compelled to do.  However, when MALIBU invokes the full force of the justice system, it must do so honorably and with clean hands; it must not do it with the intent to use the judicial process as a bludgeon to be wielded wildly.  "The federal courts are not cogs in a Plaintiff's copyright-enforcement business model.  The Court will not idly watch what is **essentially an extortion scheme**, for a case that Plaintiff has no intention of bringing to trial." *Malibu Media LLC v. John Does 1-10,* 2:12-cv-03623, Order, June 27, 2012, at p. 6 (emphasis added).  MALIBU, like a schoolyard bully, has picked on thousands of victims

and has used the judicial system as a mechanism to beat up on them.  In such a case, MALIBU's motives do matter, very much.

77.     SOUTHGATE has been damaged in her personal and professional life by the conduct of the MALIBU.  Not only has she suffered from the stress, embarrassment and indignities of these lawsuits, and from the publication of these allegations by MALIBU which expose her to public censure, shame and ridicule, her career has been natively impacted.

78.     Finally, all of the public allegations, harassing phone calls from a mass settlement "call center" and indeed the entire nationwide "campaign" are, on information and belief, based on knowingly inaccurate and/or false data that MALIBU knew does not and would not identify the alleged downloader.  Despite this malicious behavior and willful disregard for the judicial process.  MALIBU proceeded with this case with the intent and purpose of damaging SOUTHGATE.

## CLAIM FOR RELIEF II
## INVASION OF PRIVACY

79.     SOUTHGATE restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

80.     MALIBU intentionally intruded upon SOUTHGATE's solitude, seclusion and private affairs by collecting data about the access individual IP addresses made of the internet without SOUTHGATE's knowledge, authorization, or permission.

81.     MALIBU intentionally intruded upon SOUTHGATE's solitude, seclusion and private affairs by forcing Cox Communications to disclose her identifying information through the issuance of the subpoena in Case No. 3:12-cv-00369.  This information was subject to SOUTHGATE's reasonable expectation of privacy and was indeed protected by

law such that MALIBU had to obtain a subpoena (albeit by making false allegations) in order to obtain it.  *See generally*, 47 U.S.C. § 551.

82.    MALIBU publicized said false allegations – namely, the accusation that SOUTHGATE had illegally downloaded pornographic films – by placing them into a public document – namely, the First Amended Complaint against Defendant.  This information is easily accessible to any interested person who searches SOUTHGATE's name through the Google search engine and/or any other search engine.  In addition, since court documents are public, all of MALIBU's false allegations are available to the public through the court clerk's office.

83.    By making these allegations public, the MALIBU has portrayed SOUTHGATE in a false light, and has exposed SOUTHGATE to publicity that unreasonably places her in a false light before the public.

84.    The publication of these allegations is highly offensive to SOUTHGATE, as it falsely alleges illegal and distasteful activity on her part, and as such, would be highly offensive to any reasonable person.

85.    The public can have no legitimate concern in hearing false allegations whose only purpose is to intimidate, embarrass and harass.  SOUTHGATE is not a public official or a public figure in whom the public might have some legitimate interest.

86.    SOUTHGATE has been damaged in her personal and professional life by the conduct of the MALIBU.  If an individual uses the Google or Bing search engine to search SOUTHGATE's name, the first page has several entries that are all related to this lawsuit.

87.    Moreover, due to the nature of the internet, SOUTHGATE will continue to be damaged in the future by this lawsuit.  Just as gossip continues to hurt and rumors continue to swirl whether there is any truth to them or not, these allegations will remain in the public

consciousness and the public record long after this case is concluded.  In future years, when background checks are performed, the first item that appears is going to be a lawsuit involving the illegal download of pornography.

**CLAIM FOR RELIEF III**
**DEFAMATION**

88.     SOUTHGATE restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

89.     By filing the Complaint in the instant matter, MALIBU has made public false and defamatory statements about the SOUTHGATE, including but not limited to the allegations that SOUTHGATE has illegally downloaded movies that are protected by copyright, and that SOUTHGATE has downloaded pornographic movies.

90.     MALIBU acted with negligence as to the truth or falsity of these statements. MALIBU treats SOUTHGATE, as it treats all its defendants, as a cash cow to be milked at will.

91.     The statements are false because (1) SOUTHGATE has not ever downloaded any movies via BitTorrent; (2) SOUTHGATE has not ever downloaded any pornographic movies; (3) SOUTHGATE has not infringed upon MALIBU's copyrights; (4) upon information and belief, MALIBU's asserted copyrights to the movies in question are not valid; and (5) MALIBU knew or should have known that just because it allegedly discovered potentially infringing activity tied to an IP address, that does not in any way prove who the individual is who did the infringing activity (if, indeed, there was any infringing activity at all).

92.     MALIBU knew or should have known all of the above facts before filing the present action with this court.

93.     The allegations made by the MALIBU in the Complaint subject SOUTHGATE to scorn, distrust, ridicule, contempt and tend to harm her reputation.  The allegations tend to lower her in the estimation of his peers, involving as they do, illegal and contemptible and distasteful activities.

94.     The allegations made by the MALIBU in the Complaint have a tendency to injure SOUTHGATE's occupation, business or employment.  In fact, SOUTHGATE has already been hampered in attracting new clients.  The instant action is one of the first items that appears on a search of SOUTHGATE's name in the Google search engine and it appears multiple times.  This case is also one of the first items that appears on a search using the Bing search engine.  These facts clearly have had and will continue to have a negative impact on SOUTHGATE's reputation personally and professionally.  As prospective employers rely heavily on internet searches to find and verify information regarding applicants, this fact is and has been incredibly injurious to SOUTHGATE.

95.     SOUTHGATE has been, and will continue to be, damaged in her personal and professional life by the conduct of the MALIBU.  Not only has SOUTHGATE suffered from the stress, embarrassment and indignities of this lawsuit, and from the publication of these allegations by MALIBU which expose her to public censure, shame and ridicule, her career has been – and will continue to be – negatively impacted because she has had difficulty attracting new clients and will have to account for this lawsuit when interviewing for employment.  Even if MALIBU withdraws its Complaint, the detrimental effect of these allegations may linger for years.

96.     MALIBU should not be permitted to assert the defense of privilege to this claim because MALIBU comes before this court with unclean hands.  MALIBU is part of nationwide epidemic, and MALIBU has already been castigated and sanctioned by courts

in California and New York for its tactics.  MALIBU knew or should have known that it had

no evidence tying SOUTHGATE to the alleged acts of infringement, and yet it brought this

lawsuit with utter disregard for that fact.  Moreover, upon information and belief, MALIBU

intentionally and willfully placed its works on the internet as a "honeypot" or authorized its

agents and/or employees to do so, for the express purpose of luring potential infringers

who could then be sued for infringement and bullied into a settlement.  This lawsuit is not

an isolated incident; it is part of a deliberate, calculated business plan.

**CLAIM FOR RELIEF IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

97.     SOUTHGATE restates and realleges all of the allegations of the previous

paragraphs as if more fully stated herein.

98.     In all of MALIBU's actions connected with the filing of both cases (Malibu

Media LLC v. John Does 1-15 and Malibu Media LLC v. Gan Southgate), MALIBU has

acted with the specific intent to obtain a monetary settlement from every Doe at the lowest

cost possible.

99.     Once again, MALIBU's conduct in this specific case must be viewed in the

light of MALIBU's conduct in all of the cases filed in all of the Federal Districts: hundreds of

cases with thousands of Doe defendants.  In Colorado alone, MALIBU's tally is already

over 465 citizens targeted in 27 cases.   Significantly, by lumping all of these Doe

defendants together and not suing them individually, MALIBU has saved over $150,000.00

in filing fees.  At the settlement rate of 35% estimated by one IP "harvester," APMC (see

Exhibit B), MALIBU can expect approximately 163 settlements totaling anywhere from

$163,000 to $500,000 or more, assuming settlements in the range of $1,000 to $3,000

which is on the low side.  MALIBU reaps all this for an investment of less than $10,000 in

filing fees and a few hours of an attorney's time.  This misuse of the Federal Courts is outrageous and extreme.

100.   In the instant case, MALIBU's first act after obtaining SOUTHGATE's identifying information was not to attempt to protect its copyrights through various legal means but to attempt to obtain a monetary settlement from SOUTHGATE.  Moreover, MALIBU's counsel of record did not make the contact.  SOUTHGATE has never once been contacted by MALIBU's lead counsel Adam M. Silverstein or Leemore Kushner, only by Jill Jacobs and Stephanie Hanson, persons who claims to represent Malibu Media and whose name has been tied to Patrick Collins, Inc., in connection with other, similar mass copyright suits of this type.

101.   There is no way of looking at MALIBU's scheme and calling it, as MALIBU does, a legitimate means of enforcing its copyrights.  Rather, as Jude Wright in the Central District of California portrays it, it is "essentially an extortion scheme."  Malibu Media LLC v. John Does 1-10, <u>supra</u>, at p. 6.

102.   In the instant case, MALIBU alleges that SOUTHGATE downloaded pornographic films, the names of which would case any reasonable person to cringe. MALIBU's intent is clearly to cause SOUTHGATE the emotional distress, shame and embarrassment that would naturally result from a list like this being associated with one's name, because by causing such emotional anguish, MALIBU intends to motivate SOUTHGATE to pay a monetary settlement.

103.   By accusing Defendant of downloading pornographic films, MALIBU has in fact caused SOUTHGATE extreme emotional distress.  By publishing these accusations through this lawsuit, MALIBU has, in fact, caused SOUTHGATE extreme emotional distress, daily and ongoing anxiety, worry, and embarrassment.  SOUTHGATE exists in a

constant state of worry and fear over who will next discover these appalling – and false – accusations.

104.   In the instant case, MALIBU alleges that SOUTHGATE downloaded content from the internet illegally, which is offensive and damaging to SOUTHGATE's good name and reputation.  MALIBU's intent is clearly to cause SOUTHGATE the emotional distress, outrage, humiliation, and damage to one's reputation that would naturally result from such an allegation, because by causing such emotional anguish, MALIBU intends to motivate SOUTHGATE to pay a monetary settlement.

105.   By accusing SOUTHGATE of engaging in illegal internet downloads of MALIBU's pornographic films, MALIBU has in fact caused SOUTHGATE extreme emotional distress.   Until one has been falsely accused of contemptible and illegal behavior, one cannot imagine the devastating emotional impact.  But mere accusation was not enough for MALIBU: MALIBU had to make it public, exposing SOUTHGATE to contempt, humiliation and scorn among his friends, her community, her business colleagues, potential employers, and indeed, the entire world due to the broad reach of the internet.   This has, in fact, caused SOUTHGATE extreme emotional distress, daily and ongoing anxiety, worry, and embarrassment.   SOUTHGATE exists in a constant state of worry and fear over who will next discover these appalling – and false – accusations.

106.   Since the inception of the first Doe lawsuit against SOUTHGATE in February, SOUTHGATE has been consumed by worry, anxiety, fear and stress due to MALIBU's ruthless pursuit of her, an innocent victim.  Further, SOUTHGATE feels outrage and anger at being victimized by MALIBU along with so many other thousands of citizens across the country.

107.   Because of these false allegations and the MALIBU's outrageous and despicable handling of these lawsuits, SOUTHGATE has suffered both personal emotional distress and damage to her professional reputation, which damage inflicts even more stress.  Until one has been falsely accused of contemptible and illegal behavior, one cannot imagine the devastating emotional impact.  Worst of all, no matter what the outcome of this case, these false allegations may cloud SOUTHGATE's reputation for years to come.

**CLAIM FOR RELIEF V**
**DECLARATORY JUDGMENT THAT SOUTHGATE IS NOT LIABLE**
**TO MALIBU FOR COPYRIGHT INFRINGEMENT**

108.   SOUTHGATE restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

109.   Upon information and belief, MALIBU created or caused and/or authorized its agents and/or employees to create a single digital file or website containing its films in order to lure potential infringers.  This is known as a "honeypot" and it is done in order to trap infringers and, using the threat of infringement litigation as a weapon, to coerce them into a financial statement.

110.   By placing, its films in a "honeypot" to lure infringers, MALIBU explicitly and/or implicitly authorized the download, distribution and other use of its films.

111.   MALIBU is part of a nationwide scheme masterminded by a Florida attorney by which pornography companies make millions of dollars by tracking IP addresses, using call centers and/or settlement letters to pressure internet users – whose innocence is irrelevant to the pornography companies – into a settlement which is less expensive and less embarrassing than a public lawsuit, and then sharing the fees among the attorneys, the pornography companies and the tracking companies in arrangements that defy the Rules of Ethics governing the conduct of lawyers everywhere.

112.   Upon information and belief, at no time did MALIBU attempt to stop the download of its movies by removing them from the internet.  In fact, by maintaining the films as a "honeypot," it actively sought to encourage downloads in order to have more targets to extort money from.

113.   Upon information and belief, at no time did MALIBU attempt to mitigate its damages by removing the films from the internet.  Again, by maintaining the films as a "honeypot," it actively sought to encourage downloads in order to profit from infringement or allegations of infringement.

114.   Upon information and belief, at no time did MALIBU undertake to prevent any alleged infringers from continuing to infringe upon MALIBU's works, nor did MALIBU attempt to prevent any alleged infringers from selling, distributing or otherwise using MALIBU's works.  To SOUTHGATE's knowledge and belief, no DMCA takedown notices were issued, no cease-and-desist letters were ever sent, and no injunctions or restraining orders were ever sought.

115.   Thus, upon information and belief, MALIBU not only failed to prevent infringement of its allegedly copyrighted works, it actively encouraged that infringement in order to profit thereby.

116.   The MALIBU's claims in its Complaint are therefore barred by the equitable doctrines of unclean hands and estoppel.

117.   SOUTHGATE did not download any of the films listed in Exhibit B to MALIBU's Complaint, to which MALIBU claims copyright.

118.   SOUTHGATE has never downloaded any pornography whatsoever from the internet.

119.   SOUTHGATE did not participate, at any point in time, in any BitTorrent that may have downloaded any works that MALIBU alleges it owns the copyrights of.

120.   SOUTHGATE did not engage in any conduct that infringed in any way upon any copyrights alleged to be held by MALIBU.

121.   Based on all the information stated herein, an actual and continuing controversy exists between SOUTHGATE and MALIBU such that SOUTHGATE needs the court to declare the rights between the parties.

<u>**COUNT VI**</u>
**DECLARATORY JUDGMENT THAT MALIBU'S WORKS ARE NOT ENTITLED TO THE PROTECTIONS OF UNITED STATES COPYRIGHT LAW**

122.   SOUTHGATE restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

123.   Article I, Section 8, Clause 8 of the United States Constitution reads as follow: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." From this Clause, all copyright and patent law springs.

124.   Under this Clause, copyright is authorized only for works which promote the progress of science and the useful arts.

125.   MALIBU's works do not promote the progress of science.

126.   MALIBU's works do not promote the useful arts.

127.   Upon information and belief, MALIBU's works are hardcore pornography. SOUTHGATE has never seen any of these films, but judging by the graphic nature of the titles listed in Exhibit B to MALIBU's Complaint, there can be no doubt that these are pornographic.

128.   Upon information and belief, MALIBU's works depict obscene material, or in other words, MALIBU seeks to protect works which, taken as a whole, appeal to the prurient interest in sex, portray sexual conduct in a patently offensive way and, which, taken as a whole, do not have a serious literary, artistic, political or scientific value.

129.   There is no protection under the First Amendment for works that are obscene. *Roth v. United States*, 354 U.S. 476 (1957).

130.   In *Miller v. California*, 413 U.S. 15, 24 (1973), the Supreme Court stated that works which, "taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way and, which, taken as a whole, do not have any serious literary, artistic, political or scientific value" are obscene.

131.   It is unsettled in the Circuit Courts, and has not been tested in the Supreme Court, whether obscene works can be copyrighted.  That illegal and immoral works have no right to legal protections is an ancient common law doctrine stretching back to 19th century England.

132.   Hardcore pornography is not speech by any definition of the term, it is simply sex.  The fact that sexual acts take place on film does not elevate them to the level of speech.

133.   Upon information and belief, in order to create the works that are the subject of this lawsuit, MALIBU and/or its agents and/or employees violated laws which prohibit pimping, pandering, solicitation and prostitution, including any and all claims of conspiracy to commit these acts.  Thus, MALIBU's works depict criminal acts and/or conduct, and they came about as a result of criminal acts and/or conduct.

134.   The illegal act of paying others to engage in sexual conduct so that one may watch is not protected speech if done in person; doing such illegal acts and filming it does

not and should not elevate the request or the acts out of the realm of illegality or obscenity into the realm of protected speech.

135.   MALIBU's works are not copyrightable.

136.   Based upon all of the information stated herein, an actual and continuing controversy exists between Defendant and MALIBU such that SOUTHGATE needs this Court to declare the rights between the parties.

### CLAIM FOR RELIEF VII
### UNFAIR BUSINESS ACTS AND PRACTICES

137.   SOUTHGATE alleges, as if fully set forth herein, each and every allegation contained in the previous paragraphs and further alleges as follows:

138.   SOUTHGATE brings this claim pursuant to California Business & Professions Code Sections 17200 – 17500 et seq. on behalf of herself and all others similarly situated and also in a representative capacity on behalf of the general public of the State of California, under the authority of these statutes.

139.   The acts and practices of defendants as alleged herein constitute an unfair practice under the California Unfair Practices Act (Bus.&Prof. Code §§ 17200 et seq.) by, among other things, engaging in the following unfair business acts or practices:

140.   MALIBU has engaged in a deliberate, intentional and systematic course of action, knowingly relying on often false and inaccurate data, the purpose of which is not to protect their copyrights, but rather to embarrass, shame and coerce individuals who use the internet into paying a settlement in order to avoid litigation, regardless of whether those individuals have actually done anything wrong.

141.   Based upon information and belief, counsel for MALIBU does not engage in settlement discussions with putative defendants.   Upon information and belief, a "call

center" is being actively used by MALIBU to make continuing harassing and intimidating phone calls to Doe defendants, threatening them with public humiliation and, in some cases, with criminal action if the defendants do not negotiate a settlement with them.  In California this unauthorized practice of law is prohibited and violates, among other statutes, Business & Professions Code sections 6125 -6133.

142.   The sole purpose of these threats and statements is to coerce the Doe defendants into paying a quick monetary settlement of a few thousand dollars without MALIBU and MALIBU's attorney having to file an additional lawsuit (after the Doe lawsuit in which the defendant's identifying information was obtained).  Upon information and belief, the "call center" acts as MALIBU's agent in this matter with the full knowledge of MALIBU and MALIBU's counsel, and in fact at the direction of MALIBU and/or some other individual acting on MALIBU's behalf.

143.   Encouraging the continued downloading of MALIBU's works through the use of "honeypots" in order to promote the income stream to be obtained through settlements of threatened lawsuits.  In this particular case for example, there appears to be no legitimate way to purchase "Tiffany Teenagers in Love."   Indeed, an internet search of "Tiffany Teenagers in Love" results in dozens of websites all of which advertise the film as "free" to watch and/or download on their website.

144.   MALIBU has engaged in a pattern and practice of unlawful acts and courses of conduct constituting unfair business practices and unfair competition as prohibited by Business and Professions Code §§ 17200 et seq.  The pattern of business practice and the course of conduct described herein have provided MALIBU with a competitive unfair advantage over similar businesses that have not engaged in such practices.   Unless enjoined by this Court, MALIBU will continue to engage is such practices.

145.   MALIBU's conduct as described in this Counter-Claim has been immoral, unethical and oppressive, and substantially injurious to the hundreds of California defendants it has sued as it exploits their privacy, fears and vulnerability.

## DEMAND FOR A JURY TRIAL

Defendant-Counterclaimant hereby demands a trial by jury on all issues so triable.

**WHEREFORE, SOUTHGATE respectfully request judgment as follows**:

**As to the First Claim for Relief:**

1.    Find that these acts of MALIBU amount to abuse of process;

2.    Granting SOUTHGATE damages in the amount of $1 million;

3.    Granting SOUTHGATE all fees and costs of suit;

4.    For such other and further relief as the court may deem equitable and just.

**As to the Second Claim for Relief:**

1.    Find that these acts of MALIBU amount to invasion of SOUTHGATE's privacy;

2.    Granting SOUTHGATE damages in the amount of $1 million;

3.    Requiring MALIBU to pay for and take out an advertisement which shall run in the San Diego Union Tribune and San Diego Reader, which advertisement shall be no less than ¼ of a page in size and shall be run in the primary news section of each newspaper in its Sunday edition (or in the case of San Diego Reader, in one weekly edition), and which advertisement shall specifically retract the claims of the Complaint, acknowledge that MALIBU wrongfully brought this lawsuit against SOUTHGATE, state this lawsuit was groundless, acknowledge that SOUTHGATE has not infringed in any manner against the MALIBU and that SOUTHGATE is innocent of any wrong-doing in this matter, and apologize to SOUTHGATE, with the stipulation that the exact language of the

advertisement shall be subject to the review and approval of SOUTHGATE and/or her attorneys;

4.     Granting the SOUTHGATE all fees and costs of suit;

5.     For such other and further relief as the court may deem equitable and just.

**As to the Third Claim for Relief:**

1.     Find that these acts of MALIBU amount to defamation;

2.     Granting SOUTHGATE damages in the amount of $1 million;

3.     Requiring MALIBU to pay for and take out an advertisement which shall run in the San Diego Union Tribune and San Diego Reader, which advertisement shall be no less than ¼ of a page in size and shall be run in the primary news section of each newspaper in its Sunday edition (or in the case of San Diego Reader, in one weekly edition), and which advertisement shall specifically retract the claims of the Complaint, acknowledge that MALIBU wrongfully brought this lawsuit against SOUTHGATE, state this lawsuit was groundless, acknowledge that SOUTHGATE has not infringed in any manner against the MALIBU and that SOUTHGATE is innocent of any wrong-doing in this matter, and apologize to SOUTHGATE, with the stipulation that the exact language of the advertisement shall be subject to the review and approval of SOUTHGATE and/or her attorneys;

4.     Granting SOUTHGATE all fees and costs of suit;

5.     For such other and further relief as the court may deem equitable and just.

**As to the Fourth Claim for Relief:**

1.     Find that these acts of MALIBU amount to defamation;

2.     Granting SOUTHGATE damages in the amount of $1 million;

3.     Requiring MALIBU to pay for and take out an advertisement which shall run in the San Diego Union Tribune and San Diego Reader, which advertisement shall be no less than ¼ of a page in size and shall be run in the primary news section of each newspaper in its Sunday edition (or in the case of San Diego Reader, in one weekly edition), and which advertisement shall specifically retract the claims of the Complaint, acknowledge that MALIBU wrongfully brought this lawsuit against SOUTHGATE, state this lawsuit was groundless, acknowledge that SOUTHGATE has not infringed in any manner against the MALIBU and that SOUTHGATE is innocent of any wrong-doing in this matter, and apologize to SOUTHGATE, with the stipulation that the exact language of the advertisement shall be subject to the review and approval of SOUTHGATE and/or her attorneys;

4.     Granting SOUTHGATE all fees and costs of suit;

5.     For such other and further relief as the court may deem equitable and just.

**As to the Fifth Claim for Relief:**

1.     Issue a declaratory judgment that SOUTHGATE has not infringed upon any rights that MALIBU may have in the motion pictures listed in Exhibit B of its Complaint;

2.     Issue a declaratory judgment that SOUTHGATE is not liable to MALIBU for copyright infringement;

3.     Issue a declaratory judgment that MALIBU has come before this court with unclean hands;

4.     Issue a declaratory judgment that MALIBU has not mitigated damages;

5.     Issue a declaratory judgment that MALIBU is estopped from asserting its claims against SOUTHGATE;

6.     Issue a declaratory judgment that MALIBU failed to issue Digital Millennium Copyright Act (DCMA) takedown notices or otherwise seek to enjoin and prevent infringement of its works;

7.     Issue a declaratory judgment that the MALIBU not only failed to prevent the download of the works it now seeks to protect but rather encouraged and promoted said download in order to profit thereby;

8.     Issue a declaratory judgment that the MALIBU, its agents and/or employees have unlawfully and improperly instituted lawsuits not supported by facts or law and sought settlements of same, which constitutes misuse of copyright;

9.     Granting SOUTHGATE all fees and costs of suit;

10.    For such other and further relief as the court may deem equitable and just.

**As to the Sixth Claim for Relief:**

1.     Issue a declaratory judgment that each and every motion picture listed in Exhibit B of MALIBU's Complaint is obscene;

2.     Issue a declaratory judgment that each and every one of MALIBU's motion pictures listed in Exhibit B of MALIBU's Complaint are not entitled to copyright protection because they are obscene, because they do not promote the progress of science and the useful arts, and because they were created by and depict unlawful activity;

3.     Striking MALIBU's copyright registration of each and every motion picture listed in Exhibit B of MALIBU's Complaint;

4.     Finding that MALIBU is not entitled to recover statutory damages and/or attorneys' fees;

5.     Granting SOUTHGATE all fees and costs of suit; and

6.     For such other and further relief as the court may deem equitable and just.

**As to the Seventh Claim for Relief:**

1.    Find that these acts of MALIBU amount to Unfair Business Practices;

2.    Granting SOUTHGATE damages in the amount of $1 million;

3.    Granting SOUTHGATE all fees and costs of suit;

4.    Restitution and disgorgement of all fees, earnings, profits, compensation and benefit obtained as a result of MALIBU's unfair actions;

5.    An Order enjoining MALIBU, as well as its agents, employees, representatives, and all persons acting in concert or participating with them, from improperly instituting lawsuits against doe defendants not supported by facts or law, as demonstrated in this complaint, which constitutes violations of §17200 et seq.;

6.    For such other and further relief as the court may deem equitable and just.

Respectfully submitted,

**DREHER LAW FIRM**

Dated:  August 22, 2012          By:        */s/ Robert Scott Dreher*
Robert Scott Dreher
Email: scott@dreherlawfirm.com
Attorneys for Defendant/Counter-Claimant